Good morning, counsel. Good morning to you. At this time, Mr. Wechter. Good morning. Good morning. May it please the court, Larry Wechter for Mr. Larsen. I think the most significant issue for this morning is whether there was sufficient proof in the record to identify my client as the thief at the Target store. That's what I'd like to start talking about. I think the important thing in this case is to see the testimony of Mr. Lewandowski, the state's sole witness, in context. Because what happens here is he gives a detailed recitation of what he saw on the day of this retail theft. He talks about how he followed these people because they look suspicious. There was a man and a woman. He talks about where they went in the store, what they did, how he surveilled them, how close he got to them. He watched them take some diabetic test strips from the shelf. He watched them. He watched the man put it in the woman's purse. He watched them as they walked out of the store without paying. So he gives some fairly detailed testimony about what he saw. He says he got within five feet of them at some point in time. And then he says, you know, I'm the person who called the video operator and told him to focus on these people, start the tape. And then the prosecutor plays the tape in front of the witness and in front of the jury. And he says, this is an accurate tape of what happened. These are the people on this tape, ladies and gentlemen. These are the people who committed the theft. I see the man. There he is. And then the prosecutor asked him, sir, do you see the same person, that same man sitting in the courtroom? His exact words are, I cannot recognize him. But in the context of what he said so far, what does that mean? Well, counsel, is a live witness in open court the only way to identify a defendant? No. I mean, didn't the jury have the opportunity to not only view the defendant sitting at counsel table, presumably, and the videotape also? Yes. And they're the fact finders, correct? Correct. But there are two problems with that in this particular case, because these are rather unusual facts. Because, number one, again, the witness says, there he is on the tape. I see him now. Then he looks out into the courtroom and he says, no, I don't see the same person here today. Well, now, wait a minute. Were those the words? Those are not his exact words, of course. No, they weren't, were they? The record shows it was, I cannot recognize him. I cannot recognize him. I cannot recognize him. Right. So he looks at the defendant. Okay. He just looked at the tape. And he looks at the defendant. Wouldn't you find an objection on the grounds of a call for a conclusion to the witness? Yes, I believe he testified that he never saw the man's face. I thought he said that he basically saw the back of his head most of the time. It's not clear from his testimony what he sees exactly. He doesn't say whether he saw the face, whether he saw him full face, whether he saw him profile. He does say it was a white man with real short hair. I'm not sure if he had a goatee. That's the best clue we have as to how he saw him. But there's no explicit testimony, Your Honor, about the view he has of this person's face. Is it your contention that the person in the videotape was not your client? My contention is the state has the burden of proof beyond a reasonable doubt, and they didn't show that it was my client. So what I mean was it was a white person on the tape. It wasn't a black or a red or a yellow one, was it? On the tape, yes. It was a white man. Did that white male generally fit the description of how he remembered that day? Well, the problem is there's hardly any description at all. Well, short hair, maybe a goatee. That's it. All right, but did that person fit that description? The person on the tape? Yes. I want to say there was no goatee, but it's been a while since I've seen the tape. I'm not certain. But, I mean, it's such a sparse description. I think he said something about a buzz cut as to his hair. I mean, I don't recall that on the tape. But in any event, it's such a spare description, you know, it could match many, many, many people. And the problem here is, again, the problem from our perspective is at one moment he sees that person on the tape. And there's no identification in the courtroom. He looks right at the defendant and he says, you know, I can't say that's the same person. Well, no, that's not what he said. And we don't know from this record if he does look at the defendant. We know that the prosecutor says, do you see that person here in court? And he says, I don't recognize him. We don't know if he was looking at the ceiling. There's nothing in that record that says he looked at counsel table. Well, but presumably he's been sitting in the courtroom with the defendant right in front of him. Well, no, the defendant doesn't have to sit at counsel table. And a witness doesn't have to be in the courtroom and usually isn't in the courtroom. There's usually a motion to exclude witnesses prior to the beginning of trial. So that witness wasn't in the courtroom since the trial began, presumably. A witness is, you know, called in right before they're ready to testify. Sometimes they're not oriented to the courtroom and who sits where. I mean, most of the time one would expect that the prosecutor calling them would orient them to the courtroom, but sometimes they're not. But it's my understanding in the law that in order for the defendant not to be sitting at counsel table, his attorney has to ask the court for permission for that to happen, and that did not occur in this case. Mr. Larson's attorney does not say, Your Honor, we're concerned about the ID. Can he stand in the corridor for a while or whatever? I mean, this is many years ago, but I had witnesses. I had defendants who sat in the gallery for that very reason, and I didn't have identifications, amazingly. But I think that the record indicates Mr. Larson is there. Could be sitting next to the judge, for all I know, when it says there. Well, even so, how do we presume that the witness has closed his eyes or doesn't look around the courtroom to see who's in there? He still has a view of whoever is in that room and says, I don't see the same person anywhere here. Counsel, will you remind me? I know I asked you the question just a minute ago, but what is the problem you have with the jury looking at that videotape and concluding that they are one and the same person, that the defendant is the person on the videotape? Would you repeat what your answer was, please? Sure. I have two problems. One is what I was just talking about, where the witness affirmatively says, I don't see that person in the courtroom. That's problem number one. And what is the problem? If the witness says, I don't see the person, but the jury concludes differently, what is the problem? Well, the problem is this is the individual giving, pretend I'm the witness. This is the individual giving testimony, producing evidence in the courtroom. And he says, I don't see that person here. I can't identify him. He's not the same guy as on this videotape. It's not the same guy. I'm telling you, ladies and gentlemen of the jury, he's not the same guy. I can't recognize him as the same person. That's problem number one. Counsel, you're not, I don't want to put words in your mouth, so I will ask you to explain, but there seems to be two ways in which you could make this argument. One is the logic of it, and that seems to be what you've said up to this point in time. There's another possibility, and that is, is that a mugshot or a picture taken on the day of trial of your client, either in the courtroom or in the hallway or outside the courtroom, was part of a record and as well the videotape, and it's your contention that if we reviewed the tape and the mugshot and or any other pictures, we would come to the conclusion that the picture and the videotape cannot be of the same person, and therefore there should have been a reasonable doubt. Is that the contention you're making? The contention is, A, the witness says it's not the same person as far as I can tell, and B, the videotape is so poor that you can't identify a particular person independent of the witness's testimony. I don't know if you've seen the video yet, Your Honor, but on this tape, there are four segments of these people in different areas of the store. Three of them, you can't see their faces at all. So you see them from the back, you can tell what kind of clothing they're wearing, and they're just walking along doing different things. The one segment that shows the person not from the rear lasts about 15 seconds. Most of the time, either you can't see his face or you can see a profile for a second or two. He walks along, there's posts and different obstructions between the camera and the individual, so sometimes the view is blocked because he's walking behind these posts or lighting or whatever it was. There's never a full-face view of him. There's never a stationary view of him, except for about a second, where he's standing in front of something in the store like this with his head down, looking at some object, like looking towards the floor. So actually the best views of this person are in profile, but again, for a second or two. Then there's an obstruction, then for a second or two. It sounds like what your argument is in explanation, then, is that the witness did not identify the defendant in open court, and the videotape is so deficient that the jury could not conclude beyond a reasonable doubt that this was the same individual that was in the courtroom that was on the videotape. Yes, in contradiction to what the witness says. Because it puts the jury in the position, the prosecutor wants to put the jury in the position of saying, well, this witness, you know, he didn't identify him, he said he didn't recognize him as the same person, but why don't you, ladies and gentlemen, make this decision as if you're producing evidence, as if you're a witness adversarial to the person who came in here and said he didn't recognize him. How can the jury do that? Now, when you keep saying I don't recognize him as the same person, you're drawing an inference, correct? Because what the question was, the individual that you observed on the floor of Target and on the video, is that individual located in the courtroom here today? Answer, I can't recognize him. Right. It's not as the same person, he's not the same person on the video. You're drawing that inference. Is that correct? Well, that's what the question is. The question is, is the person you just told us is on the video, is that same person sitting here somewhere? Right. And he says I can't recognize him. No, no, he says I cannot recognize him. But there was other evidence, counsel, was there not? That is, the license plate, the witness did observe the couple leave the store, get into a vehicle, he described the vehicle, and the video captured the license plate. Correct. I mean, so there's not just an identification connecting them to the crime and to this incident. There is additional evidence connecting them that the jury considered. Isn't that correct? I'm sorry. There is no evidence. The problem is there is no evidence connecting the license plate number, connecting the car to the defendant. There's absolutely no testimony or evidence that this car was registered to the defendant. There is no apprehension immediately after the theft. There is no proceeds recovered. There is nothing. There is no name. You know, the witness doesn't say, well, I knew Lance Larson from years ago. I saw him before. There's absolutely nothing else in this record to connect Lance Larson to the thief and the target. So that's it. I mean, the sum and substance of the evidence is I cannot recognize him as the same person shown on this videotape. And, ladies and gentlemen, why don't you take a look at it and see what you think? Even though it's really blurry and it's really bad, and we're asking you to make an ID where the witness can't even do it. Could we turn to another topic, please? You also argue that the defendant should not have received an enhanced sentence. And based on the evidence, isn't it correct that the pre-sentence investigation reflects prior felony convictions, at least one, for the defendant? And isn't it also correct that the judge, the record reflects that the trial judge asked that the State, during the sentencing hearing, ask for an extended term, that there was no objection by the defense counsel at that time that he wasn't eligible for an extended term, nor did defense counsel make any objection to, I guess when they were asked, are there any corrections or additions to the pre-sentence investigation, defense counsel said no or didn't say anything. So based on that, how do you contend that there was no factual basis for an enhanced sentence? Well, you're correct on all your factual recitations. The argument that I made was... For extended term, I misspoke, I'm sorry. I'm sorry. Extended term sentence. Right, extended term. My argument simply is that there's no way for us to know from this pre-sentence whether there were convictions for Class 3 felonies or greater, because there's no indication in the document to demonstrate what the classification of the offenses were, and sometimes the sentences are incompatible with Class 3 offenses. Go ahead. If I may, so as I recall the case law on this, courts rely on pre-sentence reports, of course, and they're considered to be sufficient to demonstrate prior convictions without any other evidence, but my recollection is that those cases always deal with situations where it's obvious what the class of the offense is. For example, if it's an armed robbery, I mean, it's always a Class X. You know what it is. But trial counsel get these reports. They have to be submitted at least three days ahead of time. Presumably, the attorneys read them and look at the information and are prepared for the sentencing hearing. If there's something in there that isn't correct, you know, once an extended term sentence was asked for at the sentencing hearing, I think we have to assume that defense counsel would have said something. I mean, this is, you know, we're talking about a felony case. Yeah, and I understand the waiver argument, and my only pitch is you've got an axiom of extended term. Maybe we should take a look at it. But in the motion to reconsider that sentence, it wasn't so much that he should not have gotten an extended term as it was that the trial judge didn't consider the mitigating factors sufficiently. I mean, that's one of the specific allegations. And I think the other one is the court should not have found the defendant's failure to appear for the post-trial motions and sentencing was an aggravating factor. I mean, there are things in this record, apparently, that go beyond was that a felony conviction on the pre-sentence investigation. Well, I can't deny that it's not in the motion to reconsider the sentence. All right. Do I have time for the second issue, or should I come back? I'm available. Okay, thank you. Ms. Swiss, good morning. Good morning, Your Honors. Ms. Director, may it please the court, I'll begin with the reasonable doubt argument. I believe that the defense is making kind of a two-fold argument, as I understand it. One is that the loss prevention person, Leigh Ann Lewandowski, actually said this was not the person, and so, therefore, the prosecution was really asking the jurors to overrule something, find something inconsistent with what the only eyewitness was testifying to. And that's simply not correct. If you look exactly at what he said, what he said is he can't make a positive identification. That's totally different than saying this is not the man. And we rely on that then to say, okay, we don't have an affirmative identification, something which would have helped the prosecution, obviously. But what we do have is a tape, the foundation of which is not at issue. You know, even here, everybody agreed that he laid the foundation when he said that he was there. This is what he saw. It's an accurate depiction of what he saw. And so the second part, I believe, of the defense argument then is that, well, you know, we can look at this tape and the jurors looked at it. It does have evidentiary value. But here it's not much because it's grainy, because you don't see him for a certain amount of time, that type of thing. Well, our answer to that is the videotape is, you know, not something you'd see on your TV at home with your, you know, your DVD or something. But it certainly depicts this man. It's for many seconds, I believe, the defense in its brief says something like a 15-second, excuse me, part of the tape at the end, excuse me, clearly, or not clearly, but the defense admits that it's 15 seconds of showing this man, mostly in profile. But, you know, I looked at the tape. You can see the man. He comes up. He actually comes fairly close to the camera at one point. You certainly can see his face. And it's not a matter of, you know, five seconds isn't enough, ten seconds isn't enough. Here it's the jury looking at this. They have the defendant in front of them. Obviously they can watch this man throughout the trial. This isn't a split-second, you know, identification they have to make that would be, you know, perhaps something where you'd say, well, they didn't even have a good time. Do we know whether the jury saw the man in profile while he was in the courtroom? We don't know that. We don't know. All we know is that they had the defendant there during this time. And there's some indication that, you know, his appearance may have changed. And I'm saying some indication in the sense of closing argument by the prosecutor. I think referred to the fact that despite the identification being a man with a buzz cut, which is sort of neither here nor there because that identification made by Lewandowski, he says this tape depicts what he saw. So the jurors can see whether this man has what they would call a buzz cut or a little longer hair or whatever. But now you have a person in court, and he may not look exactly like this. We don't know. That's not on the record. You know, we don't have a physical description of here's what the defendant looked like in court. But the jurors have him in front of them. They can look at this. They have at least 15 seconds, maybe 20 or 30 by the time you string certain parts of the tape together with that last part. And they can see, does this man look like this man? Is this the same person? Now, that's an interesting issue that you've just raised. We don't have a description of the defendant in the courtroom as he sat there, assuming he was there. How do we review that? We don't. I mean, that's the problem with this argument, if you ask me. The jurors, we can review the tape, but the jurors had that tape. We can see what they were looking at. We can't say that what, you know, using the standard, the Collins standard, we can't say that no rational trier of fact could have found that man, the defendant who's sitting there with them, to be that man on the tape because we don't know what that person looked like. And I'm sure you would say that it was at that point defense counsel's responsibility to call the sidebar and make an offer of proof, as it were? Absolutely. If there was some indication that that was going to be important to, you know, anything on appeal, that's their burden to make the record. You can't say there's an error. Oh, we can't really – there's nothing for you to determine that there's an error on the record. But believe me, there's an error. I mean, what it comes down to is the only way the defense can make this argument at all is to say that that tape per se, nobody can make a good identification from that. I believe that has to be their argument because once you get to, you know, you can't compare it or it doesn't compare to something, their argument fails. We don't know what the defendant looked like. We can't judge that ourselves, and we'd have to be judging it anyway under the proper standard, which is, you know, would any rational trier of fact be able to determine this? We don't have the other side of the equation as it is. And so in that sense, you know, this error, I mean, you can allege this error, but I don't believe you can prove that the error occurred. Let's go back then to the state's burden of proof in this case, and we have one witness who testifies. I can't recognize him. After he goes through, I think, as Mr. Wechter accurately, generally, this was the tape. This accurately reflects the, you know, our foundation is good. Is there some authority that the state has found that says, well, we can work with that. We can use the tape as our primary evidence? I looked. I looked for a case with facts similar to this. I could find no case with similar facts. I could find cases where certainly, you know, they were clear that while somebody who was there and could testify that this is what he saw, he could have, you know, identified the person from the tape even. And I also found cases where they certainly said, but you can't usurp the juror's function because they also can take this evidence and be looking at it and make their own determination. And that's what we rely on is the fact that, okay, we had a person who, you know, we would have liked him to make the identification. Certainly the juries are aware that he didn't, and that goes to their determination of whether they believe that tape is strong enough evidence that this person is the defendant sitting in the courtroom. But they had that information, and they made that determination. And having done that, I don't believe there's any way on this record that that can be reversed, you know, unless, as a matter of course, this tape is just so grainy or, you know, so deficient in some way. And I don't believe it is. It's got at least a 15-second section at the end. It's got a few seconds here and there before that. You see him coming closer. You see him in profile. You certainly can see the man's face. I mean, you know, like I say, it's not a DVD quality, but it's there. It's not a Blu-ray. Right. But you believe it can, you believe that you can make. Well enough to make a determination, you know, as to somebody in the courtroom. Then the obvious question is why couldn't Mr. Lewandowski? Well, that is the obvious question, and, you know, I mean, certainly I can only speculate, and I suppose I can say he's being so cautious in saying for sure that this person is that person. Also, and I think one of your honors already said this, and I pointed it out in my brief, he said we were trained to follow and surveil from behind, and I followed him throughout. I mean, at one point he goes into a different aisle even to make sure that he's not noticed, but mostly he's following from behind the entire time. That's his testimony, and I picked up three or four parts out and put it into my brief that I saw from the back. I followed him from 10 steps behind. We were trained to do this from the back, and I think that explains something too, that he may not have felt confident, you know, that he knew what that person's face looked like enough to make the identification. What was the time frame from the theft up until time of trial? I honestly don't recall that. I don't know. I don't remember. With regard to the extended sentence and what was reflected in the pre-sentence investigation, there was a listing of prior convictions, but how do we know that any one of them was a felony, since there apparently was no indication, and how is that sufficient for a trial judge to impose an extended term? Well, it's sufficient because, again, when all the parties, I mean, from the start, from the bond hearing to discussing, you know, extended term was mentioned from the start. At the bond hearing, defense counsel said nothing. When they're talking in terms of sentencing, when they're asking is the pre-sentence investigation report accurate, we're talking extended sentence here, he never spoke up. When the post-trial motion is filed, the post-sentencing motion is filed, but he does not dispute that extended term sentencing is the correct sentence here. And what we have is not something which, you know, pre-sentence report, and I cited several cases in my brief, is sufficient evidence of this. You know, there's an ambiguity in the sense that it does not say class 3 or class, you know, I think class 3 would probably be the aggravated battery, and there were several retail thefts. But it has to be a class 3. But there's an ambiguity, but an ambiguity does not, again, rise to the level of an error. You know, in order to show a record that shows an error at this point, given a waiver of all this and an acquiescence in this, you know, I mean, it speaks volumes, I think, and shows that certainly defense counsel throughout believed this man was, you know, the defendant was eligible for extended term. To now say, okay, because the state didn't go further, never having been asked to go further, and, you know, and show that one of those convictions actually was something, you know, something to show additional facts to establish, that has been totally waived. And what we have now is this ambiguity. Ambiguity is not an error. What we have is something three, I think three retail thefts, as I recall, and an aggravated battery, all of which could be class 3, all of which have sentences which are consistent with class 3. So the argument that, well, it's also consistent possibly with something lesser. Well, possibly, but that's certainly not, you know, an error that's established of record. That's an ambiguity, an ambiguity that could have been cleared up, but instead it was acquiesced in, and at this point for us to determine or, you know, for the defense to make the argument that this court can make that into an error, I believe they haven't shown the error. Could the, would the state's, what's the state's position on the fact that, while apparently the defendant did not show up for several of the proceedings, would that be sufficient to impose an extended term? The fact that they were, you know. I mean, that's obviously something the court could consider, and it appears that the court did from the motion to reconsider, but would that be sufficient for an extended term? Your Honor, I didn't look at that, and I'm not sure under, you know, under the factors whether that would be something that, and interestingly in answer to your question, I know that the court never specified why they were coming up with the extended term. That is, you know, that is the fact. They never said, the court never said, we're looking at your priors, you know, and that's where we get the extended term from. But, again, if there was some confusion as to why he was eligible for extended term, it would be upon the defendant to say, you know, we're not, the defense to say the defendant is not eligible, or, you know, where are you getting that factor, or what are you determining that on, or to put that in a post-sentencing motion. Can we take judicial notice of what his criminal record is, and can we, upon examination of his criminal record, determine whether or not there were felonies that would result in extended term, regardless of what the trial court's on? So, in other words, at this point, take judicial notice of his record. Well, my point is, I believe we can take judicial notice of easily proven facts in court records. And I would think that we probably could take judicial notice of his criminal history report. And if we did, we could clarify whether or not there was an ambiguity around it. The other question I have, I don't know if you want to respond to that, but the other question I have is, I believe the lawyer, the defense counsel, said something affected the minimum sentence based upon the extended term was 10 years, but he didn't think that was an appropriate sentence in this circumstance, did he not? He said the minimum, I'm sorry, the minimum? Sentence was 10 years based upon an extended term. There's nothing in this appeal that relates to ineffectiveness of counsel, is there? No, there is not. No, no. And I did not pick up on that, but that's what he said. But that issue was not even raised. As far as the judicial notice, you know, I think that I would suggest that, first of all, I mean, I believe it's a defense function to ask the court to take judicial notice. It hasn't been asked in this case. But also, I would suggest that it's really – Is that an effectiveness of the public counsel? I don't know. I don't think I would go there. But I also think that it's not necessary. When you have parties acquiescing, I mean, I think this is the perfect case where you have to say it's a waiver. When everybody believes from start to finish this person is eligible to go further and have to start looking for proof of, you know, independent proof. Can this court take judicial notice? Perhaps it can. I mean, it's easily ascertainable. But then when would, you know, would the prosecution be relieved of a burden because this court could always take judicial notice of certain things? I think that we have to determine, did the state put in enough? Did the state put in a PSI which shows things that are totally consistent with this Class 3 extended term sentence? And once they've done that, barring something which shows that this ambiguity is actually an error, I believe there's nothing more, you know, to be determined at that point. That's the way I would view that. And briefly, then I'll get into the foundation for just a minute. The state tried to get the value in in several instances and was foreclosed from doing so, one of which I point out I believe was perfectly proper, which is when Wendelsky was asked, you know, and he testified, I am a loss prevention agent for Target. I'm trained in high theft items and what those are, and I know them. I'm trained in, or I'm not sure he said exactly I'm trained in, but as part of his training, I'm also familiar with the value of these items. And particularly, he said the diabetics test strips were a high theft item and he's familiar with them. But the court found a lack of foundation when there was an objection and sustained it. The court, or excuse me, the prosecution then went at it several different ways. And one of the things that they got out when they were trying to establish a foundation for, you know, a cash register receipt and then the Palm Pilot was that this loss prevention agent saw what he believed to be seven diabetic strips boxes put into a basket with these two people. He then verified that by, and he says, I first of all went and looked at the shelf. I knew how the shelf for the diabetics strips was stocked ahead of time. And I then looked after they left. And knowing how they were stocked and looking at the whole, I could determine the seven boxes were actually taken or were now gone after the defendant left. Given that, we now have him testifying that he's got a value from a Palm Pilot, scanning in these SKUs that they have. And I think I pronounced, I think I went with SKU, S-K-E-W throughout, but I think it's S-K-U. And it has something to do with, you know, how many units are left, that type of thing. And at any rate, he uses this, goes back to the shelf, and uses it properly by at least nobody suggests that he uses it improperly. He's trained on it. He does say that. And it's really not part of the foundation. But what we have is we have a value then that he gets from the Palm Pilot. And it would be our position, and I think at page 24 of the defense brief, they suggest that it seems to be computer generated. It would be, you know, certainly our view that it is computer generated, not computer stored. It's not like somebody went in and typed in certain values and that type of thing and then had a computer print out what they had inputted. This is a computer generated type of function. Through the scans, through the barcodes, it somehow through a computer program is able to read that information and put it into useful information in terms of inventory in the store. And then by this man then, you know, scanning, it can tell you how many should have been there and then obviously how many are gone. But it takes this function of inventory and it can read the scan and also show value. What we have is we know that this particular loss agent has verified independently that seven boxes are gone. He uses the scan. What does it show? It shows seven boxes are gone and they're valued at this. It's clearly working properly and it's accurate if it comes up with the same number of boxes gone reading this scan that it's reading. And so it's our position that there is sufficient foundation for that scan to be used in that manner, that computer to be used in that manner, and to generate this information. Thank you. Anything further? No. Okay. Thank you, counsel. Thank you. Mr. Wechter. Justice McLaren, the theft occurred in September of 06 and the trial in September of 08, almost exactly two years to the day later. Two years and two days. Right. From the time of the alleged theft to the jury verdict. Right. Okay. I think it was a one-day trial. I think it was the same. Thank you. Everything happened on the same day. If I could just make a general comment about the identification issue. It seems to me that counsel and the court have raised a lot of questions about, you know, what went on in this courtroom and why didn't this witness identify the defendant and what exactly happened? Did he see his profile or whatever? It seems to me that all of these problems, let's call them, go directly to the state's burden of proof. But, all right, I asked Ms. Swiss if she had any authority. Do you have any specific authority or anything that we can use more closely, more recently, since this brief has been prepared that says that the jury cannot observe that same piece of evidence and having observed the defendant for a day make that identification? I found no case authority of anywhere near this fact pattern where the witness can't make the identification, doesn't make the identification, and the jury is asked to basically to override that. The closest cases I could find were cases like Dowaliby where the witness sees a profile and the court says, hey, that's not enough, or Dante where the Supreme Court says, hey, there was no identification. The fact that people with the same names were located at the scene of the crime, that's your only connection to the defendant, that's not sufficient. I mean, those are the closest cases that I could find. I think that's because in situations like this, normally the defendant is acquitted. Normally the judge grants a motion for directed verdict. I mean, the proof is so weak and it's so difficult to show it's the same person. But my point is, what is defense counsel supposed to do? Is he supposed to make a record for the prosecution? I mean, I think he did exactly the right thing. That's what I would do in this situation. I'd keep my mouth shut. I wouldn't say one thing on the record. I wouldn't make note of anything. It's their burden to show where the witness is sitting in the courtroom, where the defendant is sitting. Is it a profile? What's he wearing? What's his facial hair? That's their problem. Every prosecutor knows he's supposed to do that. I agree, but there's a risk that because a jury was chosen as opposed to a trial court, that this jury could look at that tape and find otherwise. And that being the case, I'm not suggesting that defense counsel should stand up in front of the jury and say, now, ladies and gentlemen, I want the record to reflect, although it might have been an interesting strategy. But there are sidebars and there are other situations so that you could, not you personally, but defense counsel could preserve a record in what he believed to be an unlikely event his client was found guilty. But every time he would do that, he takes a risk, doesn't he? He takes a risk that he's adding to the record, that he's helping the state, that he's producing evidence. Well, the state probably had this big surprise look on his face, one I can't recognize, and he might have been doing cartwheels across the room. But we don't know that either. Right, but things we don't know shouldn't be held against the defendant. They should be held against the state. And if the state had some explanation for why Mr. Lewandowski didn't identify the defendant, it was incumbent on them to indicate it in the record. The problem is, counsel, you're here on appeal, and on appeal it's your burden now. It's not the state's burden anymore. And so I agree with you that it's quite possible or probable that the lawyer should have kept his mouth closed. However, I would also suggest to you that he should have filed a post-trial motion, and he should have said all the things that you just said on the record. And then at least somebody could disagree or agree that that's what happened. And then you could raise these arguments affirmatively on appeal. But once there's a verdict of guilty and you decide to appeal it, there's a different burden on review than what's in the trial court below. It shifts from the state to you. And you're arguing the state's burden at the trial court level and talking about quiet. But the problem is that once you get up here, there's a case called Fouch v. Bryant, I believe, that says if you don't prepare an appropriate record to establish error, you lose. It's not a question of waiver or forfeiture below. It's a question of whether or not you've established reversible error. Right. But what I'm trying to respond to are all these questions that have been raised about, well, we don't know whether the defendant was sitting in the courtroom with his back to the witness. I mean, now we're in the realm of speculation and trying to uphold a verdict that, at least on the face of it, seems to be supported by extremely weak evidence. Have you heard of the statement, absence of evidence is not evidence of absence? I think I heard it from you once. Well, that's what I think you have a problem with. That's all I have to say. Okay. And if I can, on the pound pilot issue, very briefly. Well, let me ask a question real fast about sentencing. If we're to look at this on a plain error basis, what's the error? I need a specific error. Your brief talks about an ambiguity or not clearly identified, but what's the specific error? The error is there's not sufficient proof that he was convicted of a Class 3 felony previously. Even though there are sentences that certainly reflect Class 3 felony situations? Well, there are sentences, there are a number of sentences, and some of them that are supposed to be for aggravated battery, a Class 3, can't be imposed on a Class 3. You can't give somebody a fine only for an aggravated battery. So, obviously, there's some inconsistency between saying, or some insufficiency in saying, he was convicted of aggravated battery and I fined him $200. So you're saying that the error is insufficiency. It's not that they're, okay, that's all. It's like a burden proof question. All right. I'm a pound pilot. The problem is that Lewandowski only says, I remember what the pound pilot told me. It said the value is such and such. He never testifies, I know that the value was $440, or I know each individual test strip is worth approximately so much money. He never explains how the pound pilot works. I take exception with Ms. Swiss's statement. We don't know this thing is working properly. He never testifies to how it works, whether he checked it. He doesn't say anything about it, absolutely nothing, other than he's trained to use it. He pointed it at a barcode and then he pushed a button. Are there any standards currently out there, as with our breathalyzer machines and our radar guns, that indicate that these have to be calibrated or checked on a regular basis? Not to my knowledge, but there has to be foundation at a trial. You have to say this computer works this way or it's accurate or it's standard or something like that. And there's absolutely nothing. He just says I pointed it and it gave me a number. I hate to ask you this because I've asked you a similar question before, but have you found any authority? I mean, we've got some computer-generated law out there. A lot of it is federal, but is there anything that you've found that relates to this particular issue? To a pound pilot? A pound pilot that is, according to the person using it, designed to deal with inventory issues, which is how this was set up. I don't recall seeing anything that specific. All the cases that I saw dealing with computer generation or computer storage have either one standard or another standard for a foundation, depending on how restrictive the type of device is. But all of them say you've got to tell us that it works right. Okay. Thank you very much. Thank you both. The Court will take the matter under advisement and render a decision in due course.